UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL WALTER PAYETTE #29206,

        Plaintiff,                  Case No. 2:10-cv-204

v.                                        Honorable R. Allan Edgar

UNKNOWN RONDEAU, et al.,

        Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Rassmusen, Rankin, Lindemuth and Bauman. The Court will serve the complaint against Defendants Berg, Harris, Rondeau, Tennyson, Irvine and De Young, with regard to Plaintiff's claim that he was deprived of a mattress and soap.

**Discussion**

I. Factual allegations

Plaintiff Michael Walter Payette #29206 is a state prisoner currently confined at the Baraga Maximum Correctional Facility (AMF). Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Sergeant Unknown Rondeau, Unknown Rassmusen, R.N., Assistant Resident Unit Supervisor Unknown Harris, Corrections Officer Unknown Berg, Corrections Officer Unknown Tennyson, Corrections Officer Unknown Irvine, Corrections Officer Unknown De Young, Sergeant Unknown Rankin, Resident Unit Manager Unknown Lindemuth, and Warden Unknown Bauman.

In Plaintiff's complaint, he claims that in January of 2010, he received two misconduct tickets from Defendant Rassmusen for allegedly masturbating in front of her and for refusing to stop or to cover up when so ordered. Defendant Rondeau did not review the misconduct report with Plaintiff, and instead called him "white trash" and said that Plaintiff was a disgrace to the white race for "jacking off on Nurse Maki." Defendant Rondeau refused Plaintiff's request for witnesses and for a hearing investigator. Plaintiff claims that Defendant Rasmussen had written identical misconduct tickets on him in January of 2009.

Plaintiff alleges that on January 15, 2010, Defendant Rondeau came to his cell and asked him if he wanted to attend his hearing. Plaintiff was sleeping at first and when he realized what was being asked, he immediately stated that he did wish to attend. Defendant Rondeau said that it was too late and that he had already put Plaintiff down as refusing to attend. Plaintiff subsequently told Defendant Berg about the incident and stated that if Defendant Berg did not get

him to the hearing, he was going to break his cell window. Defendant Berg responded, "Now I'm really not going to do anything for you."

Approximately one hour later, Plaintiff spoke to Defendant Harris and requested his assistance. Defendant Harris refused to help Plaintiff, but stated that Defendant Rondeau might just be "messing with" Plaintiff, and that he might have marked Plaintiff down as wanting to attend his hearing. Plaintiff responded that since Defendant Harris was Defendant Rondeau's supervisor, he was responsible for making sure that Plaintiff was able to attend the hearing. Plaintiff then told Defendant Harris that if he did not see to it that Plaintiff was escorted to his hearing, he would break his cell front window. Defendant Harris stated that he did not negotiate with terrorists.

Plaintiff states that at 10:45 a.m., Plaintiff was told that the Hearing Officer had come and gone. Plaintiff then broke his cell window by kicking it. Defendant De Young made rounds shortly thereafter and wrote Plaintiff a misconduct ticket for destruction of property over $10.00. Within 15 minutes, all of the Defendants showed up, except for Defendant Rassmusen, and instructed Plaintiff to come out of his cell for a shakedown. Plaintiff was placed in cuffs and taken to the shower "cage," where he was strip searched. Plaintiff contends that during the strip search, he was required to fondle his genitalia and spread his buttocks in front of Defendants Tennyson and Harris. Plaintiff was taken back to his cell on a "dog leash-like-in handcuffs," and discovered that all of his clothing, sheets and mattress and been taken from his cell. Plaintiff states that he was never given a contraband removal slip. Plaintiff also states that it took him a few hours to put his legal and other property back in order, and that almost all of his legal work was thrown away.

Plaintiff states that the misconduct ticket alleged that he had taken strings out of the mattress covers, but that nothing in the report indicated why his sheets had been taken as contraband.

Plaintiff contends that removing strings from a mattress is a common occurrence in segregation as indigent prisoners often do not have dental floss, but that prisoners rarely receive misconduct tickets or lose their mattresses as a result.

On January 18 or 19, 2010, Plaintiff was moved off B wing and out of cell #212 to a less desirable and more abusive wing on the first level. Plaintiff was placed in cell #101 and within 10 seconds, he kicked and broke the cell window. About one hour later, a captain came to Plaintiff's cell front and asked Plaintiff what was going on, and whether there would be any more problems. The captain listened to Plaintiff's concerns and told Plaintiff that he was going to "bite the bullet" and not punish Plaintiff for breaking the window. However, Plaintiff states that Defendant Bauman ordered that Plaintiff be placed in hard restraints. About one hour later, a move team took Plaintiff from his cell. Plaintiff saw Defendant Tennyson move towards his property, and Plaintiff asked Defendant Rankin to please protect his property from theft. Defendant Rankin assured Plaintiff that he would not let anything happen to the property. However, after Plaintiff saw Defendant Tennyson go towards his cell, he heard a loud sound in his cell.

Shortly after being placed in full hard restraints, Plaintiff was taken back to cell #101 with the broken glass and left for 72 hours. During this time, Plaintiff was not supplied with soap, he was deprived of two of his meals, and did not have toilet paper for two out of the three days. On January 21, 2010, Plaintiff's property was returned. However, the property had been taken out of the footlocker and "trashed." Plaintiff discovered that some of his books were missing, as were 15 bars of Plaintiff's moisturizer and all but one bar of soap. Plaintiff was also missing about half of his hygiene products.

Plaintiff asserts that for an entire year prior to that Plaintiff had been approved for indigent loans each month to buy soap and hygiene items from the prisoner store. However, following this incident, until approximately May 12, 2010, Plaintiff had difficulty receiving hygiene items and Defendant Harris refused to intervene on Plaintiff's behalf, but told Plaintiff that prison staff was going to treat him the way that he deserved to be treated. Plaintiff asserts that from to May, he was approved for a $10 soap loan, but that his store orders were simply thrown away and not processed. Plaintiff states that he was completely omitted from the indigent list in January of 2010, and was not placed back on the list until after he broke his cell door window on the 15th and 18th of January.

Plaintiff states that after his hygiene items were taken, he asked for soap and toothpaste. Within two days, Defendant Harris brought Plaintiff 6 or 7 toothpaste packs worth $1.16, and about 8 bars of small soaps worth approximately $0.40. Defendant Harris brought them in an envelope "on the down low." In March and April of 2010, Plaintiff did not receive his store order. Plaintiff asked Defendant Harris for soap, but Defendant Harris refused to help him. In April of 2010, Plaintiff was without soap for three days. Plaintiff wrote a letters to Defendant Bauman, to no avail. Plaintiff finally placed a sign in his window stating that he had been without soap for __ days, and adding to the number each day. Plaintiff states that he was eventually able to get some soap from another inmate by "fishing" with mattress string.

Plaintiff states that he was without his mattress, sheets and pajamas from January 15, 2010, until March 15, 2010. Plaintiff states that he finally complained to Defendant Lindemuth, and that he was subsequently given a mattress by Defendant De Young. Plaintiff alleges that in either

December of 2009 or January of 2010, Defendant Tennyson denied Plaintiff his yard and, when Plaintiff threatened to sue him, Defendant Tennyson told him that he did not care.

Plaintiff claims that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages.

II.  Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1949. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Ashcroft*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff claims that Defendants' refusal to allow him to participate in his major misconduct hearing violated his rights under the Fourteenth Amendment. A prisoner's ability to challenge a prison misconduct conviction depends on whether the convictions implicated any liberty interest. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate

>under the circumstances and required by the Due Process Clause to
>insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff does not allege that his major misconduct convictions resulted in any loss of good-time credits, nor could he. The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[1] for prisoners convicted for crimes occurring after April 1, 1987. In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. 481 F.3d at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. 355 F. App'x at 912; *accord, Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at *4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) ("plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), adopted as judgment of court, Order of Jan. 4, 2011. In the absence of a demonstrated liberty interest, plaintiff has no due-process claim. *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation. *See Sandin v. Connor*, 515 U.S. 472 (1995). Plaintiff has not

---

[1] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system. MICH. COMP. LAWS § 800.33(5).

identified any significant deprivation arising from his convictions. Although some of the restraints to which plaintiff was subjected (such as hard restraints) may qualify as atypical if imposed for punitive reasons on a misconduct conviction, there is no evidence that such restraints were so used in this case. Rather, these restraints were applied by order of the Warden in an effort to control plaintiff's violent outbursts (after he had kicked out his cell window), not as sanctions ordered by the hearing officer. Unless a prison misconduct conviction results in an extension of the duration of a prisoner's sentence or some other atypical hardship, a due-process claim fails. *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004).

Plaintiff also claims that his property was stolen from his cell by Defendant Tennyson in violation of his procedural due process rights. Plaintiff's due process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).

In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U.S. 527, 542-44 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986); *see also Jones v. Scroggy*, Nos. 87-5753, 87-5754, 1988 WL 12111, at *1 (6th Cir. Feb. 17, 1988) (affirming dismissal of Plaintiff's claim that prison officials failed to recover a radio and head phones stolen

from him by another inmate because state provided adequate post-deprivation remedies). Numerous state post-deprivation remedies are available to Michigan prisoners. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Nov. 15, 2004). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; Policy Directive, 04.07.112, ¶ B. Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a).

Plaintiff has not alleged that state post-deprivation remedies are inadequate. In order to satisfy due process, the post-deprivation remedy does not have to guarantee a successful outcome, nor is it required to provide relief equivalent to that available in a § 1983 action. *See Parratt*, 451 U.S. at 543-44. As the Court has instructed: "Although the state remedies may not provide . . . all the relief which may have been available . . . under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Parratt*, 451 U.S. at 544. Due process only requires that an adequate post-deprivation remedy be available when the deprivation of property occurs. *Id.* at 544. The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995). Because there were an adequate post-deprivation remedies available to Plaintiff, his claim regarding the alleged theft of his property will be dismissed.

Plaintiff also claims that all of the Defendants's actions were taken in retaliation for Plaintiff's conduct of breaking his cell window. Retaliation based upon a prisoner's exercise of his

or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Prisoner's act of breaking his cell window in protest for perceived mistreatment by prison officials was not protected conduct because a prisoner does not have a constitutionally protected right to destroy prison property. Therefore, because Plaintiff was not engaged in protected conduct, his retaliation claim lacks merit.

In addition, Plaintiff claims that Defendants' violated his rights under the Eighth Amendment. Plaintiff claims that after he kicked out his cell door window for the second time in less than 5 days, he was placed in hard restraints and remained in those restraints for 72 hours. Plaintiff's claim involving the use of restraints must be analyzed under the Supreme Court authority limiting the use of force against prisoners. This analysis must be made in the context of the constant admonitions by the Supreme Court regarding the deference that courts must accord to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes*, 452 U.S. 347. The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178-79 (2010). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; *Wilkins*, 130 S. Ct. at 1178. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 6-7 (citing *Whitley*, 475 U.S. at 321); *accord Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). Physical restraints are constitutionally permissible where there is penological justification for their use. *Rhodes*, 452 U.S. at 346; *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th Cir. Feb. 15, 1996); *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at * 1 (6th Cir. Feb. 1, 1994); *Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995).

Plaintiff's claim fails because it is clear from his allegations that there was a penological justification for the use of restraints, and, thus, the restraints were constitutionally permissible. Defendant Bauman ordered that Plaintiff be placed in restraints after he kicked out his cell door window for the second time in less than 5 days. In his complaint, Plaintiff refers to times in the past where he had broken his cell window and was not placed in restraints. It appears that Plaintiff chronically resorted to the flamboyant destruction of his property in order to express his

displeasure for the conduct of prison officials. The fact that Defendant Bauman determined that his conduct required the use of restraints on one particular occasion, but not on others, does not signify that the force used was excessive.

In numerous cases, the Sixth Circuit has held that restraints were penologically justified where in light of the inmate's disruptive behavior, the inmate continued to pose a threat. *See Hayes*, 1994 WL 28606, at *1 (significant threat of further destructive behavior justified application of top-of-bed restraints against inmate); *Harris v. Ohio Dep't of Rehab/Corr.*, No. 91-3920, 1992 WL 56999, at *2 (6th Cir. Mar. 24, 1992) (requiring inmate to wear restraint belt during visits was penologically justified); *Boswell v. Vidor*, No. 89-2372, 1990 WL 143501, at *1 (6th Cir. Oct. 2, 1990) (placing inmate in full restraints for twelve hours was justified where inmate had disobeyed a direct order by repeatedly refusing to return plastic gloves given to him for cleaning his cell); *Syncate-El v. Toombs*, No. 92-1421, 1992 WL 301270, at *2 (6th Cir. Oct. 21, 1992) (use of body chains during non-contact visits was justified in light of significant threat of further assaultive behavior given inmate's history of disruptive behavior). In this case, Plaintiff repeatedly destroyed property and apparently felt that such conduct was an appropriate way to protest prison conditions. Therefore, restraints were are still justified even when the disruptive behavior had been discontinued. *See Rivers*, 1995 WL 603313, at *2 (top-of-bed restraints were appropriate even after inmate discontinued his earlier abusive, disruptive, and threatening behavior). Likewise, prisoners may be strip searched under circumstances that are reasonably related to the legitimate penological interest of security and order. *See Roden v. Sowders*, 84 F. App'x 611, 613 (6th Cir. Dec. 15, 2003) (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992)). Plaintiff's claim fails because it is clear

from his allegations that there was a penological justification for both the strip search and the use of restraints, and, thus, the measures were constitutionally permissible.

Moreover, Plaintiff does not even suggest in his complaint that he was subjected to any physical injury whatsoever as a result of the strip search or the use of restraints. Rather, Plaintiff claims a mental or emotional injury as a result of the incident. Title 42 U.S.C. § 1997e(e) precludes any claim by a prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury." The Sixth Circuit repeatedly has held that Eighth Amendment claims for monetary relief based on mental or emotional injury are precluded by § 1997e(e) absent a showing of physical injury. *See, e.g.*, *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008); *Merchant v. Hawk-Sawyer*, No. 01-6244, 2002 WL 927026, at *2 (6th Cir. May 7, 2002); *Garrison v. Walters*, No. 00-1662, 2001 WL 1006271, at *2 (6th Cir. Aug. 24, 2001); *Robinson v. Corrections Corp. of America*, No. 99-5741, 2001 WL 857204, at *1 (6th Cir. June 20, 2001); *Oliver v. Sundquist*, No. 00-6372, 2001 WL 669994, at *2 (6th Cir. June 7, 2001); *Williams v. Ollis*, Nos. 99-2168, 99-2234, 2000 WL 1434459 (6th Cir. Sept. 2000); *Raines-Bey v. Garber*, No. 99-1471, 2000 WL 658721, at *1 (6th Cir. May 12, 2000). Because Plaintiff does not allege that he suffered a physical injury, there exists no predicate for his emotional distress claim.

Plaintiff also claims that Defendants Berg, Harris, Rondeau, Tennyson, Irvine and De Young deprived him of his mattress, pajamas and sheets for a period of 6 weeks and was forced to sleep on the cement floor in violation of the Eighth Amendment. In addition, Plaintiff states that he was forced to be without soap for days at a time during April of 2010. The court concludes that these claims are not clearly frivolous and may not be dismissed upon initial review.

**Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Defendants Rassmusen, Rankin, Lindemuth and Bauman will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve the complaint against Defendants Berg, Harris, Rondeau, Tennyson, Irvine and De Young, with regard to Plaintiff's claim that he was deprived of a mattress and soap.

An Order consistent with this Opinion will be entered.


Dated: 7/26/2011                     /s/ R. Allan Edgar
                                     R. Allan Edgar
                                     United States District Judge